

DEFENDANT'S EXHIBIT NO. 1



DEFENDANT'S EXHIBIT NO. 2



1

2                    DEFENDANT'S EXHIBIT NO. 2a

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25





1                    DEFENDANT'S EXHIBIT NO. 3
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



DEFENDANT'S
EXHIBIT
3



1              DEFENDANT'S EXHIBIT NO. 3a





DEFENDANT'S EXHIBIT NO. 5



1

DEFENDANT'S EXHIBIT NO. 6

2

3

4

5

(Excerpt of video tape)

6

7

8

(In the custody of the District Clerk.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

100

1               DEFENDANT'S EXHIBIT NO. 7

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25





DEFENDANT'S EXHIBIT NO. 11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



DEFENDANT'S EXHIBIT NO. 11a

THIS SPACE FOR AUSTIN OFFICE USE ONLY

**AFFIDAVIT AND APPLICATION FOR CERTIFIED COPY OF TEXAS CERTIFICATE OF TITLE FOR A BOAT OR OUTBOARD MOTOR**

TEXAS PARKS AND WILDLIFE DEPARTMENT ● 4200 SMITH SCHOOL ROAD ● AUSTIN, TEXAS 78744
Phone No. (512) 389-4828 or 1-800-262-8755
SEPARATE APPLICATION FORM AND FEES REQUIRED FOR EACH TITLE REQUESTED

| Make of Boat or Outboard Motor | B   TX Number | Title Number |
|---|---|---|
| *Correct Craft* | *72492E* | *0019112024585* |
| Hull Identification or Serial Number | Name of Owner On Record | |
| *CTC 12623 M 82 F* | *Hudson Harold G* | |

**READ CAREFULLY AND CHECK ONLY ONE BLOCK**

[X] **"CERTIFIED COPY OF ORIGINAL"** -- No liens recorded on original title.  Owner must sign this application.

[ ] **"CERTIFIED COPY OF ORIGINAL"** -- Lien recorded on original title.  Lienholder **must** sign the application if lien has not been cleared from Department's records, EVEN IF THE LIEN HAS BEEN PAID.  THE LIEN WILL BE SHOWN ON TITLE.

[ ] **"CERTIFIED COPY DUPLICATE OF ORIGINAL"** (Blank on Back) -- This title is not for transfer of ownership and may be used for registration purposes only - Owner must sign this application.

Applicant hereby directs the Texas Parks and Wildlife Department to deliver the title herein applied for to the person shown below.

Name  *Jonathan D Drew*

Address _____

City _____ State _____ Zip _____

I am the recorded owner or lienholder of the above described boat/motor and the certificate of title covering said boat/motor has been lost or destroyed.  I further state that in consideration of the issuance of a Certificate of Title in this situation, I hereby indemnify and hold harmless the Texas Parks and Wildlife Department, its employees and officers from and against all claims, demands, and judgments because of or in connection with the issuance of the Certificate of Title for the above described boat or motor.

**I HEREBY CERTIFY THAT ALL STATEMENTS IN THIS DOCUMENT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.**

Signature of Applicant (no lien) or
Signature of Lienholder (if lien on record) *Harold S Hudson*  Date *10/24/98*

Firm Name _____
(If Firm Name has changed - show complete progression of name changes - "fka" or "nka")

WARNING: FALSIFYING INFORMATION ON DOCUMENTS IS A PUNISHABLE OFFENSE
Texas Penal Code Chapter 37 Section 37.10
Any person who knowingly makes a false entry in, or false alteration of a governmental record is guilty of a felony of the third degree punishable by confinement in jail for any term of not more than 10 years or less than 2 years and punished by a fine not to exceed $10,000.

**FEE $15.00 OR AUSTIN ONLY QUICK TITLE FEE $40.00**

PWD 124-A1100 (9/95) Previous editions obsolete - destroy stock

DEFENDANT'S
EXHIBIT
*11A*



1                    JOINT EXHIBIT NO. 1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Cause No. 799303

THE STATE OF TEXAS            In the 183rd District Court

V.                           of

JONATHAN DREW               Harris County, Texas

STIPULATION

The State of Texas stipulates that ~~the~~

a DNA analysis of items recovered from

the "rape kit" testified to by Tamara

Casares revealed ~~~~ DNA inconsistent

with Tamara Casares and Jonathan

Drew. Only one "male fraction DNA

component" was identified.

Joseph S. Owmby
Assistant District Attorney
Harris County, Texas

Approved,

Mike DeGeurin
Defendants' Attorney

1          MCV-1 EXHIBIT NO. 1

2

3

4

5          (Newspaper articles)

6

7

8

9

10

11     (In the custody of the District Clerk.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1          MCV EXHIBIT NO. 2
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



| Date | Location | Prejudicial Content |
|---|---|---|
| 12-2-98 | front pg. Metro | **WOMAN, 23, DIES AFTER ABDUCTION**<br>Drew remained in jail with no bond set.<br>Flood found in Drew's truck "nearly nude and unconscious."<br>Flood curled up in fetal position & screamed "don't rape me."<br>"I don't know if she jumped out of the truck to get away from him, if she fell out during the attack, or he got out & drug her out of the truck by her ankles...but something along those lines happened to her..."  Lawrence said.<br>Drew has refused to cooperate with the investigation. |
| 12-3-98 | front pg. Metro | **CLEAR LAKE SLAYING CASE WIDENS/SUSPECT CHARGED IN OTHER ATTACKS**<br>Charged him in 2 earlier Clear Lake area attacks<br>Possible link to other attacks on women in that area, including Jessica Cain.<br>Drew has not cooperated.<br>"Calder address raised eyebrows among police because of the infamous 'Killing Field' murders–the slaying of 4 young women whose bodies were found in a field along Calder."<br>Victim in October case & November 1997 case identified Drew in photo lineup.<br>She (other victim) told police Drew forced his way through the driver's side door...raped by both men...<br>Police have received several calls, including 1 from Chicago from women who claimed Drew had assaulted them. |

| | | |
|---|---|---|
| 12-4-98 | front pg. Metro | **FRIENDS TELL HOW VICTIM WAS SEIZED/TINA FLOOD'S SCREAMS FOR HELP DIDN'T SAVE HER**<br>"Jonathon Drew seemed normal"<br>"He's a murderer.  He's a rapist & everything else. He deserves to die." said Chapman.<br>"It was a big plan. He knew what he was doing..." said Chapman |
| 12-5-98 | | **POLICE FIND NO EVIDENCE TO LINK MAN TO OTHER CASES/SUSPECT ALREADY ACCUSED IN ATTACKS ON WOMEN**<br>Suspicious that Drew had his pickup towed out of the mud in early morning hours.<br>Confiscated women's clothing from parent's house.<br>Drew usually seemed intoxicated & even tried to start a fight. (Said wrecker driver) "He had a real bad attitude" |
| 12-9-98 | | **POND DRAINED, EXCAVATED AFTER DOGS PICK UP SCENT**<br>Dogs trained to smell cadavers picked up a scent on pond.<br>Confiscated women's clothing from parent's house.<br>Lab results showed Flood had been sexually assaulted. |
| 12-10-98 | | **DREDGED POND YIELDS NO MURDER CLUES** |

| 12-11-98 | front pg. Metro | **WOMEN'S UNDERWEAR, TEETH FOUND IN SEARCH/POLICE CONFISCATE ITEMS FROM SUSPECT'S HOME**<br>"Ski caps, human teeth & women's underwear were among items confiscated from the former home..."<br>"also suspected of 2 rapes & a possible abduction in Austin"<br>"seized items include a small wooden baseball bat with an unknown stain...pair of black panties, a flat metal bar with an unknown stain, 4 ski caps, and a small vial containing human teeth"<br>"attempted kidnap victim said Drew ...picked up a bottle, broke it...cutting her..."<br>"Another victim, who was abducted while sitting at a traffic light...said Drew...raped her for several hours... threatening to kill her..."<br>"2 possible sexual assaults & a possible abduction in Austin"<br>"It is the opinion...that the man in the surveillance photo & Drew are the same person" (affidavit by Det. Slade) |
|---|---|---|
| 12-17-98 | | **AUTHORITIES RELEASE SKETCH OF MAN BELIEVED TO BE DREW'S ACCOMPLICE** |
| 12-22-98 | | **JAN. 15 BAIL HEARING DATE SET FOR DREW/JUDGE ALSO SCHEDULES 'PROOF-EVIDENT' HEARING** |
| 1-23-99 | Front pg. Metro | **OVERCOME BY EMOTION/ BAIL $500,000 IN SLAYING CASE/ TOO HIGH SAYS DEFENSE LAWYER**<br>(Picture of grandma crying, surrounded by others crying) Grandmother, Betty Craker said she felt like she had just come "face to face with the devil." |

| 1-28-99 | | **SUSPECT INDICTED IN 2 NEW CASES**<br>Bond set in these cases at $200,000.<br>The woman told...Drew grabbed her wrist & attempted to drag her into the car, but she broke free. Drew picked up a bottle, broke it, grabbed her again, cutting her...<br>Another woman identified Drew as the man who abducted her...raped her for several hours, threatening to kill her.<br>Drew, who has lived in Austin...been investigated for similar crimes there. |
| 6-29-99 | | **ATTORNEY HOSPITALIZED AFTER ILLNESS** |

1                       MCV EXHIBIT NO. 3

2

3

4

5

6

7                         (Videotape)

8

9

10

11

12

13        (In the custody of the District Clerk.)

14

15

16

17

18

19

20

21

22

23

24

25

1               MCV EXHIBIT NO. 3A

2

3

4

5

6

7               (Newspaper accounts)

8

9

10

11

12

13      (In the custody of the District Clerk.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    MCV EXHIBIT NO. 4a

2

3

4

5

6

7                    (Newspaper accounts)

8

9

10

11

12

13        (In the custody of the District Clerk.)

14

15

16

17

18

19

20

21

22

23

24

25

1            MCV EXHIBIT NO. 4

2

3

4

5

6

7                (Videotape)

8

9

10

11

12

13     (In the custody of the District Clerk.)

14

15

16

17

18

19

20

21

22

23

24

25

1          MCV EXHIBIT NO. 5

2

3

4

5

6

7              (Videotape)

8

9

10

11

12

13     (In the custody of the District Clerk.)

14

15

16

17

18

19

20

21

22

23

24

25



1                    MCV EXHIBIT NO. 6

2

3

4

5

6

7                         (Videotape)

8

9

10

11

12

13        (In the custody of the District Clerk.)

14

15

16

17

18

19

20

21

22

23

24

25



1           MCV EXHIBIT NO. 7

2

3

4

5

6

7               (Newspaper accounts)

8

9

10

11

12

13      (In the custody of the District Clerk.)

14

15

16

17

18

19

20

21

22

23

24

25



1                        MCV EXHIBIT NO. 25a

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



DEFENDANT'S
EXHIBIT
4CV-95A

PENGAD-Bayonne, N. J.



Thursday, Sept. 9, 1999

# Auto possibly linked to missing teen to be searched

**By KEVIN MORAN**
Houston Chronicle

LA MARQUE — The owner of an Izuzu Amigo that could be linked to the August, 1997 disappearance of Tiki Island teen Jessica Cain has given permission to search the vehicle, police said Wednesday.

The car was serviced at a used car dealership where Jonathan David Drew, 26, a mechanic already charged in the December abduction and slaying of Tina Michelle Flood, 23, once worked,

according to a private investigator whose information prompted police to impound the red Amigo last week.

Investigator Willie Payne said an ex-girlfriend of Drew's drove the car while it was owned by the dealership and that Drew had access to it at various times. Payne has said he is trying to locate records indicating whether Drew might have had the car when Cain disappeared as she drove home from a Houston restaurant.

Some witnesses reported seeing a red Amigo near Cain's truck on Interstale 45. Her locked truck was

found parked on the southbound shoulder of I-45 in La Marque.

Police at first thought they would have to get a search warrant to comb the Amigo for evidence that might link it to the Cain case, but La Marque police Lt. Willy Bird said prosecutors who researched the case decided an affidavit from the car's current owner would suffice.

Bird declined to reveal the name of the Amigo's current owner.

Sheriff's department evidence technicians will examine the Amigo within the next few days.

tute officials in June, accusing them of fraud and deceptive trade practices.

Steve Gregg, the institute's president, declined comment on the lawsuit, which is pending.

Gregg, however, insisted that school officials inform all prospective students about the academic degrees and how the curriculum is specifically designed to prepare students for jobs.

Some four-year colleges do accept the institute's class credits from students, Gregg said.

The institute, which enrolls about 1,600 students, is private. However, the Texas Higher Education Coordinating Board — a public agency that approves higher education degrees in this state — has authorized the Houston school to award associate of applied arts degrees and associate of applied science degrees.

PETER OUNDJIAN, Cond
CHRISTINA JENNINGS, flute
(First Prize Winner of the 1999 HSI
Hogg Young Artists Competition)

VAUGHN WILLIAMS *Fantasia on...*
*Theme of Thomas Tallis*

ZWILICH Concerto for Flute and

MENDELSSOHN Symphony No.

Ticket

Seating is general admission.

For Tic
(713) 2

Speed R

# It's No Fun When Storms Hit and Your Power is Lost.
# Thanks for Your Patience While We Restored Service.

1                       MCV EXHIBIT NO. 26a

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


DEFENDANT'S
EXHIBIT
MCV-26A

Sunday, Sept. 5, 1999    Houston Chronicle    ★★★★*    **47A**

# Impounded vehicle may yield clues to case of missing teen

**IN MEMORIAM**



ng Memory Of
**LAWRENCE CRAFT**
Sept. 5, 1997

rs has passed
ike just yesterday.
told stopped beating
ning eyes at rest
my heart to prove
takes the best
ou had to leave me,
lid go alone,
me with you
d took you home.
lking in his garden and
beautiful rose, and in
re not dead. You are in
with the Lord.
be forgotten to others
rt of the past.
love and lost you your
will always last.
Eternal Love
**Bessie Craft**

Staff and wire reports

Galveston County investigators plan to sift through the contents of a red Isuzu sport utility vehicle this week to determine if it contains evidence in the 1997 disappearance of a Tiki Island teen-ager.

The Isuzu Amigo, located last week, has been impounded and turned over to Galveston County sheriff's deputies.

"We will go over this truck with a fine-toothed comb," Galveston County Sheriff's Chief Deputy Gean Leonard said Saturday night.

"In the meantime, there are people trying to determine exactly where that truck was on the night of Jessica Cain's disappearance," he said.

The investigation is being led by detectives in the La Marque Police Department, who could not be reached for comment Saturday. The FBI has assisted the investigation.

Cain disappeared in August 1997, on her way home to Tiki Island from a Houston-area restaurant. Her truck, a beige Ford pickup, was found parked and abandoned along the southbound shoulder of Interstate 45 in La Marque.



Cain

Witnesses told authorities they had seen a red Amigo traveling alongside Cain's truck near the spot where her vehicle later was found.

Leonard said several detectives have spent years fruitlessly searching for a car that matched the description.

The break in the case may have come last week, when an investigator found a car fitting the description.

Private investigator Willie Payne told the Galveston County Daily News he traced a red Isuzu Amigo to the ex-girlfriend of Jonathan David Drew, 26, of League City, a mechanic already charged in the December abduction and slaying of Tina Michelle Flood, 23.

The Amigo in the possession of Drew's ex-girlfriend belonged to a used-car dealership at the time of Cain's disappearance, Payne said. As a mechanic who serviced vehicles for that dealership, Drew had access to the Amigo on more than one occasion, Payne told the newspaper.

"It's just a matter of getting the vehicle records and finding out if he had the Amigo on the day she disappeared."

"They told me he had picked it up and repaired it on many occasions. They know he worked on it, but they don't know when," Payne said.

Drew also faces charges in a reported sexual assault on a League City woman in November 1997, and an October kidnapping attempt. He is being held without bail in Harris County jail.

Payne said he first learned of the vehicle in February 1998, before Drew's arrest, when he traced it to a Seabrook man who had recently bought it from the dealership.

## Man, 22, accused of firing shots at off-duty officers

**By ERIC HANSON**
Houston Chronicle

A 22-year-old man was charged with attempted murder Saturday after shots were fired at two off-duty Houston police officers outside a downtown Houston club.

No one was injured in the 3:30 a.m. shooting at the corner of Milam and Franklin, said HPD homicide detective C.E. Elliott.

Elliott said seven young men tried to enter the Living Room, an after-hours club, and were asked to leave when one of them did not pay the cover charge.

An argument broke out at the entrance of the club and eventually the group left and walked to their car a short distance away.

Elliott said that Sgt. W.R. Cumbess,



TOUCH THE NEWS THAT TOUCHES YOU

**BIG IDEAS**
**FOR SMALL BUSINESS**

Read The Chronicle's Small Business page

Available every Sunday in The Chronicle's Business section

**COLEMAN**
7 - 1993

hter, it's hard to be-
years ago today that I
our memory grows &
ouch the hearts of all
. Your family & friends
t that you're still in
that ever, you have
them to the Lord. For
s, each of us know you
more than just a part
s within me & I care
. You're still the hugs,
neath me in my life.
aughter, & know that
one. We are connected



1          COURT EXHIBIT NO. 1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# LUNAR AND PLANETARY INSTITUTE

3600 BAY AREA BLVD.   HOUSTON, TEXAS 77058-1113   FAX (281) 486-2173   TELEX:: 7400832 LAPIUC



DIRECTORS OFFICE
(281) 486-2180

September 8, 1999

To Whom It May Concern:

This is to certify that Charles E. Canniff is terminating his employment with
Universities Space Research Association at the Lunar and Planetary Institute
effective or on about September 15, 1999. A copy of his termination notice to his
department manager is attached.

Sincerely,

Cecilia M. Hoelscher
Administrative Coordinator

/cmh



Universities Space Research Association

**Canniff, Charlie**

| | |
|---|---|
| **From:** | Canniff, Charlie |
| **Sent:** | Monday, August 30, 1999 3:54 PM |
| **To:** | Leung, Kin |
| **Subject:** | Notice |

Kin, this to inform you of my notice to terminate employment with USRA. I am giving a two week notice with a proviso that i may extend my stay beyond the two weeks due to waiting on the closing on my house.

Thanks

Charlie

1

**Michael group**



9-22-97

PROMULGATED BY THE TEXAS REAL ESTATE COMMISSION (TREC)
# ONE TO FOUR FAMILY RESIDENTIAL CONTRACT (RESALE)

## FHA INSURED OR VA GUARANTEED FINANCING
Notice: Not For Use For Condominium Transactions

**1. PARTIES:** _____**CHARLES E. CANNIFF**_____ (Seller) agrees to sell and convey to _____**LEONARDO CAMPOS**_____ (Buyer) and Buyer agrees to buy from Seller the Property described below.

**2. PROPERTY: Lot** __3__ **, Block** __9__ **,** _____**BERVELLY HILLS SEC 1**_____ Addition, City of _____**HOUSTON**_____, _____**HARRIS**_____ County, Texas, known as _____**10110 OLENTANGY**_____ (Address/Zip Code), or as described on attached exhibit, together with the following items, if any: curtains and rods, draperies and rods, valances, blinds, window shades, screens, shutters, awnings, wall-to-wall carpeting, mirrors fixed in place, ceiling fans, attic fans, mail boxes, television antennas and satellite dish system with controls and equipment, permanently installed heating and air conditioning units, window air conditioning units, built-in security and fire detection equipment, plumbing and lighting fixtures, including chandeliers, water softener, stove, built-in kitchen equipment, garage door openers with controls, built-in cleaning equipment, all swimming pool equipment and maintenance accessories, shrubbery, landscaping, permanently installed outdoor cooking equipment, built-in fireplace screens, artificial fireplace logs and all other property owned by Seller and attached to the above described real property except the following property which is not included: **N/A**

**N/A**

All property sold by this contract is called the "Property." The Property ☒ is ☐ is not subject to mandatory membership in an owners' association. The TREC Addendum for Property Subject To Mandatory Membership In An Owners' Association ☒ is ☐ is not attached. *C.C. L.C. C.C.*

**3. SALES PRICE:**
A. Cash portion of the Sales Price payable by Buyer at closing . . . . . . . . . . . *1599.- 3%* $ **1,605.00**
B. Sum of all financing described below (excluding VA Funding Fee or FHA Mortgage Insurance Premium [MIP]). . . . . . . . . . . . . . . . . . . . . . . . *51701.-* $ **51,895.00**
C. Sales Price (Sum of A and B). . . . . . . . . . . . . . . . . . . . . . . . . . . *53,300.* $ ~~53,500.00~~

**4. FINANCING:** Within __DONE__ days after the effective date of this contract Buyer shall apply for and make every reasonable effort to obtain financing. Financing will be deemed to have been obtained when the lender has determined that Buyer has satisfied all of lender's financial requirements (those items relating to Buyer's net worth, income and creditworthiness). If financing (including any financed MIP or Funding Fee) is not obtained within __25__ days after the effective date hereof, this contract will terminate and the earnest money will refunded to Buyer. The portion of the Sales Price not payable in cash will be paid as follows: *C.C. C.C. CEC*
(Check applicable boxes below) *51701 — L.C.*

☒ A. FHA INSURED FINANCING: This contract is subject to approval for Buyer of a Section __203__ FHA insured loan of not less than $~~51,895.00~~ (excluding any financed MIP), amortizable monthly for not less than __30__ years, with interest not to exceed __LENDE__% per annum for the first __30__ year(s) of the loan.

As required by HUD-FHA, if FHA valuation is unknown, *"It is expressly agreed that, notwithstanding any other provisions of this contract, the purchaser (Buyer) shall not be obligated to complete the purchase of the Property described herein or to incur any penalty by forfeiture of earnest money deposits or otherwise unless the purchaser (Buyer) has been given in accordance with HUD/FHA or VA requirements a written statement issued by the Federal Housing Commissioner, Department of Veterans Affairs, or a Direct Endorsement Lender setting forth the appraised value of the Property of not less than $~~53,500.00~~ 53300 —. The purchaser (Buyer) shall have the privilege and option of proceeding with consummation of the contract without regard to the amount of the*

Initialed for identification by Buyer *L.C* and Seller *CEC*     *C.C.*

y One Software, PO Box 2489, Amarillo, TX 79105 (888) 363-8515

Provided by: Broker 08/30/1999

Residential Contract Concerning _____10110 OLENTANGY_____ Page Two    9-22-97
(Address of Property)

appraised valuation. The appraised valuation is arrived at to determine the maximum mortgage the Department of Housing and Urban Development will insure. HUD does not warrant the value or the condition of the Property. The purchaser (Buyer) should satisfy himself/herself that the price and the condition of the Property are acceptable." If the FHA appraised value of the Property (excluding closing costs and MIP) is less than the Sales Price (3O above), Seller may reduce the Sales Price to an amount equal to the FHA appraised value (excluding closing costs and MIP) and the parties to the sale shall close the sale at such lower Sales Price with appropriate adjustments to 3A and 3B above.

☐ B. VA GUARANTEED FINANCING: This contract is subject to approval for Buyer of a VA guaranteed loan of not less than $N/A_____(excluding any financed Funding Fee), amortizable monthly for not less than ___N/A___ years, with interest not to exceed __N/A_ % per annum for the first _N/A_ year(s) of the loan.

VA NOTICE TO BUYER: "It is expressly agreed that, notwithstanding any other provisions of this contract, the Buyer shall not incur any penalty by forfeiture of earnest money or otherwise or be obligated to complete the purchase of the Property described herein, if the contract purchase price or cost exceeds the reasonable value of the Property established by the Department of Veterans Affairs. The Buyer shall, however, have the privilege and option of proceeding with the consummation of this contract without regard to the amount of the reasonable value established by the Department of Veterans Affairs."

If Buyer elects to complete the purchase at an amount In excess of the reasonable value established by VA, Buyer shall pay such excess amount in cash from a source which Buyer agrees to disclose to the VA and which Buyer represents will not be from borrowed funds except as approved by VA. If VA reasonable value of the Property is less than the Sales Price (3C above), Seller may reduce the Sales Price to an amount equal to the VA reasonable value and the parties to the sale shall close at such lower Sales Price with appropriate adjustments to 3A and 3B above.

☐ C. TEXAS VETERANS' HOUSING ASSISTANCE PROGRAM LOAN: This contract is subject to approval for Buyer of a Texas Veterans' Housing Assistance Program Loan of $N/A_____ for a period of at least ___N/A___ years at the interest rate established by the Texas Veterans' Land Board at the time of closing.

**5. EARNEST MONEY:** Buyer shall deposit $500.00_____ as earnest money with **STEWART TITLE** **TITLE**                                    at 281-440-7111
(Address), as escrow agent, upon execution of this contract by both parties. Additional earnest money of $ N/A_____ must be deposited by Buyer with escrow agent on or before N/A_____,19N/A. If Buyer fails to deposit the earnest money as required by this contract, Buyer will be in default.

**6. TITLE POLICY AND SURVEY:**

☒ A. TITLE POLICY: Seller shall furnish to Buyer at ☒ Seller's ☐ Buyer's expense an owner policy of title insurance (the Title Policy) issued by **STEWART TITLE**_____ (the Title Company) in the amount of the Sales Price, dated at or after closing, insuring Buyer against loss under the provisions of the Title Policy, subject to the promulgated exclusions (including existing building and zoning ordinances) and the following exceptions:
   (1) Restrictive covenants common to the platted subdivision in which the Property is located.
   (2) The standard printed exception for standby fees, taxes and assessments.
   (3) Liens created as part of the financing described in Paragraph 4.
   (4) Utility easements created by the dedication deed or plat of the subdivision in which the Property is located.
   (5) Reservations or exceptions otherwise permitted by this contract or as may be approved by Buyer in writing.
   (6) The standard printed exception as to discrepancies, conflicts, shortages in area or boundary lines, encroachments or protrusions, or overlapping improvements.
   (7) The standard printed exception as to marital rights.
   (8) The standard printed exception as to waters, tidelands, beaches, streams, and related matters.
Within 20 days after the Title Company receives a copy of this contract, Seller shall furnish to Buyer a commitment for title insurance (the Commitment) and, at Buyer's expense, legible copies of restrictive covenants and documents evidencing exceptions in the Commitment other than the standard printed exceptions. Seller authorizes the Title Company to mail or hand deliver the Commitment and

Initialed for identification by Buyer ___E.E.___ and Seller __CEC__                   TREC NO. 21-3
                                                                                        N⁰ 026

Try One Software, PO Box 2489, Amarillo, TX 79105 (888) 383-8515

Provided by: Broker 04/30/1999



related documents to Buyer at Buyer's address shown below. If the Commitment is not delivered to Buyer within the specified time, the time for delivery will be automatically extended up to 15 days. Buyer will have 7 days after the receipt of the Commitment to object in writing to matters disclosed in the Commitment.

☒ B. SURVEY: Within _____3_____ days after Buyer's receipt of a survey furnished to a third-party lender at ☐ Seller's ☒ Buyer's expense, Buyer may object in writing to any matter shown on the survey which constitutes a defect or encumbrance to title.

The survey must be made by a Registered Professional Land Surveyor acceptable to the Title Company and any lender. Utility easements created by the dedication deed and plat of the subdivision in which the Property is located will not be a basis for objection.

Buyer may object to existing building and zoning ordinances, items 6A(1) through (8) above and matters shown on the survey if Buyer determines that any such ordinance, items or matters prohibits the following use or activity: N/A _____
N/A _____ .

Buyer's failure to object under Paragraph 6A or 6B within the time allowed will constitute a waiver of Buyer's right to object; except that the requirements in Schedule C of the Commitment will not be deemed to have been waived. Seller shall cure the timely objections of Buyer or any third party lender within 15 days from the date Seller receives the objections and the Closing Date will be extended as necessary. If objections are not cured by the extended Closing Date, this contract will terminate and the earnest money will be refunded to Buyer unless Buyer elects to waive the objections.

**NOTICE TO SELLER AND BUYER:**
(1) Broker advises Buyer to have an abstract of title covering the Property examined by an attorney of Buyer's selection, or Buyer should be furnished with or obtain a Title Policy. If a Title Policy is furnished, the Commitment should be promptly reviewed by an attorney of Buyer's choice due to the time limitations on Buyer's right to object.

(2) If the Property is situated in a utility or other statutorily created district providing water, sewer, drainage, or flood control facilities and services, Chapter 49 of the Texas Water Code requires Seller to deliver and Buyer to sign the statutory notice relating to the tax rate, bonded indebtedness, or standby fee of the district prior to final execution of this contract.

(3) If the Property abuts the tidally influenced waters of the state, Section 33.135, Texas Natural Resources Code, requires a notice regarding coastal area property to be included in the contract. An addendum either promulgated by TREC or required by the parties should be used.

(4) Buyer is advised that the presence of wetlands, toxic substances including asbestos and wastes or other environmental hazards or the presence of a threatened or endangered species or its habitat may affect Buyer's intended use of the Property. If Buyer is concerned about these matters, an addendum either promulgated by TREC or required by the parties should be used.

(5) Unless expressly prohibited in writing by the parties, Seller may continue to show the Property for sale and to receive, negotiate and accept back-up offers.

(6) Any residential service contract that is purchased in connection with this transaction should be reviewed for the scope of coverage, exclusions and limitations. **The purchase of a residential service contract is optional. Similar coverage may be purchased from various companies authorized to do business in Texas.**

**7. PROPERTY CONDITION:**
A. INSPECTIONS, ACCESS AND UTILITIES: Buyer may have the Property inspected by an inspector selected by Buyer, licensed by TREC or otherwise permitted by law to make such inspections. Seller shall permit access to the Property at reasonable times for inspection, repairs and treatment and for reinspection after repairs and treatment have been completed. Seller shall pay for turning on utilities for inspection and reinspection.

B. SELLER'S DISCLOSURE NOTICE PURSUANT TO SECTION 5.008, TEXAS PROPERTY CODE (Notice) (check one box only):
☒ (1) Buyer has received the Notice.
☐ (2) Buyer has not received the Notice. Within _____N/A_____ days after the effective date of this contract, Seller shall deliver the Notice to Buyer. If Buyer does not receive the Notice, Buyer

Initialed for identification by Buyer __L.C.__ and Seller _CFC_

TREC NO. 21-3
№ 026

Provided by: Broker 08/30/1999

Residential Contract Concerning _____ (Address of Property)    Page Four

may terminate this contract at any time prior to the closing. If Seller delivers the Notice, Buyer may terminate this contract for any reason within 7 days after Buyer receives the Notice or prior to the closing, whichever first occurs.

❑ (3) The Texas Property Code does not require this Seller to furnish the Notice.

C. SELLER'S DISCLOSURE OF LEAD-BASED PAINT AND LEAD-BASED PAINT HAZARDS is required by Federal law for a residential dwelling constructed prior to 1978. An addendum providing such disclosure ❑ is ❑ is not attached.

D. ACCEPTANCE OF PROPERTY CONDITION: (check one box only):

❑ (1) In addition to any earnest money deposited with escrow agent, Buyer has paid Seller $N/A _____ (the "Option Fee") for the unrestricted right to terminate this contract by giving notice of termination to Seller within ____ N/A ____ days after the effective date of this contract. If Buyer gives notice of termination within the time specified, the Option Fee will not be refunded, however, any earnest money will be refunded to Buyer. If Buyer does not give notice of termination within the time specified, Buyer will be deemed to have accepted the Property in its current condition and the Option Fee ❑ will ❑ will not be credited to the Sales Price at closing.

☒ (2) Buyer accepts the Property in its present condition; provided Seller, at Seller's expense, shall complete the following repairs and treatment: **TERMITES IF NEEDED**

_____

E. LENDER REQUIRED REPAIRS AND TREATMENTS (REPAIRS): Unless otherwise agreed in writing, neither party is obligated to pay for lender required repairs or treatments for wood destroying insects. If the cost of lender required repairs exceeds 5% of the Sales Price, Buyer may terminate this contract.

F. COMPLETION OF REPAIRS AND TREATMENT. Unless otherwise agreed by the parties in writing, Seller shall complete all agreed repairs and treatment prior to the Closing Date. Repairs and treatments must be performed by persons who regularly provide such repairs or treatments. At Buyer's election, any transferable warranties received by Seller with respect to the repairs will be transferred to Buyer at Buyer's expense. If Seller fails to complete any agreed repairs and treatment prior to the Closing Date, Buyer may do so and the Closing Date will be extended up to 15 days, if necessary, to complete repairs and treatment.

8. **BROKERS' FEES:** All obligations of the parties for payment of brokers' fees are contained in separate written agreements.

9. **CLOSING:** The closing of the sale will be on or before _____ **SEPTEMBER 30** _____,1999 , or within 7 days after objections to matters disclosed in the Commitment or by the survey have been cured, whichever date is later (the Closing Date). If financing has been obtained pursuant to Paragraph 4, the Closing Date will be extended up to 15 days if necessary to comply with lender's closing requirements, for example: appraisal, survey, insurance policies, lender-required repairs, closing documents). If either party fails to close this sale by the Closing Date, the non-defaulting party will be entitled to exercise the remedies contained in Paragraph 15. At closing Seller shall furnish tax statements or certificates showing no delinquent taxes and a general warranty deed conveying good and indefeasible title showing no additional exceptions to those permitted in Paragraph 6.

10. **POSSESSION:** Seller shall deliver possession of the Property to Buyer on **FUNDING & CLOSING** _____ in its present or required repaired condition, ordinary wear and tear excepted. Any possession by Buyer prior to closing or by Seller after closing which is not authorized by a temporary lease form promulgated by TREC or required by the parties will establish a tenancy at sufferance relationship between the parties. Consult your insurance agent prior to change of ownership or possession as insurance coverage may be limited or terminated. The absence of a written lease or appropriate insurance coverage may expose the parties to economic loss.

Initialed for identification by Buyer __L.C.__ and Seller __CBC__

TREC NO. 21-3
№ 026

Provided by: Broker 08/30/1999

Residential Contract Concerning __10110 OLENTANGY.__ Page Five    9-22-97
(Address of Property)

7. **SPECIAL PROVISIONS:** (Insert only factual statements and business details applicable to this sale. TREC rules prohibit licensees from adding factual statements or business details for which a contract addendum, lease or other form has been promulgated by TREC for mandatory use.)

1.- SELLER TO CONTRIBUTE $ 800.00 WITH TOWARDS BUYERS CLOSING COST AND PRE-PAID + FHA fees

2.- PROVIDE 1YR HOME WARRANTY NOT TO EXCEED $300.00          C . C .

3.- REFRIGERATOR TO REMAIN IN THE HOUSE          L . C

          CEC

**12. SETTLEMENT AND OTHER EXPENSES:**

A. The following expenses must be paid at or prior to closing:

(1) Appraisal fees will be paid by __BUYER__ .

(2) The total of the loan discount fees (including any Texas Veterans' Housing Assistance Program Participation Fee) may not exceed _____ __N/A__% of the loan of which Seller shall pay __N/A_____ and Buyer shall pay the remainder. The total of any buydown fees may not exceed __N/A_____ which will be paid by __N/A__ .

(3) Seller's Expenses: Releases of existing liens, including prepayment penalties and recording fees; tax statements or certificates; preparation of deed; one-half of escrow fee; expenses FHA or VA prohibits Buyer to pay; and other expenses stipulated to be paid by Seller under other provisions of this contract.

(4) Buyer's Expenses: Interest on the note(s) from date of disbursement to one month prior to dates of first monthly payments, expenses stipulated to be paid by Buyer under other provisions of this contract; any customary Texas Veterans' Housing Assistance Program Loan costs for Buyer; and premiums for mortgagee title policy and endorsements required by lender.

(a) FHA Buyer: All prepaid items required by applicable HUD-FHA or other regulations, including required premiums for flood and hazard insurance, reserve deposits for other insurance, ad valorem taxes and special governmental assessments; expenses incident to any loan, including preparation of loan documents, recording fees, copies of restrictions and easements, amortization schedule, loan origination fee, loan commitment fee, credit reports, photos, loan related inspection fee; and one-half of escrow fee.

(b) VA Buyer: All prepaid items, including required premiums for flood and hazard insurance, reserve deposits for other insurance, ad valorem taxes and special governmental assessments; expenses incident to any loan, including credit reports, recording fees, loan origination fee, loan related inspection fees.

B. The VA Loan Funding Fee or FHA Mortgage Insurance Premium (MIP) not to exceed __N/A_____ will be paid by Buyer, and ❑ paid in cash at closing ❑ added to the amount of the loan or ❑ paid as follows: __N/A__

__N/A__ .

C. If any expense exceeds an amount expressly stated in this contract for such expense to be paid by a party, that party may terminate this contract unless the other party agrees to pay such excess. In no event will Buyer pay charges and fees expressly prohibited by FHA, VA or other governmental loan program regulations.

**13. PRORATIONS:** Taxes for the current year, maintenance fees, assessments, dues and rents will be prorated through the Closing Date. If taxes for the current year vary from the amount prorated at closing, the parties will adjust the prorations when tax statements for the current year are available. If taxes are not paid at or prior to closing, Buyer will be obligated to pay taxes for the current year.

**14. CASUALTY LOSS:** If any part of the Property is damaged or destroyed by fire or other casualty loss after the effective date of the contract, Seller shall restore the Property to its previous condition as soon as reasonably possible, but in any event by the Closing Date. If Seller fails to do so due to factors beyond Seller's control, Buyer may either (a) terminate this contract and the earnest money will be refunded to Buyer (b) extend the time for performance up to 15 days and the Closing Date will be extended as necessary or (c) accept the Property in its damaged condition and accept an assignment of insurance proceeds. Seller's obligations under this paragraph are independent of any obligations of Seller under Paragraph 7.

          C.C .

Initialed for identification by Buyer __L.C__ and Seller __CEC__          TREC NO. 21-3

          № 026

Alamo Title One Software, PO Box 2489, Amarillo, TX 79105 (888) 383-8515

Provided by: Broker 08/30/1999

Residential Contract Concerning _____ 10110 OLENTANGY
(Address of Property)

15. **DEFAULT:** If Buyer fails to comply with this contract, Buyer will be in default, and Seller may either (a) enforce specific performance, seek such other relief as may be provided by law, or both, or (b) terminate this contract and receive the earnest money as liquidated damages, thereby releasing both parties from this contract. If, due to factors beyond Seller's control, Seller fails within the time allowed to make any non-casualty repairs or deliver the Commitment, Buyer may either (a) extend the time for performance up to 15 days and the Closing Date will be extended as necessary or (b) terminate this contract as the sole remedy and receive the earnest money. If Seller fails to comply with this contract for any other reason, Seller will be in default and Buyer may either (a) enforce specific performance, seek such other relief as may be provided by law, or both, or (b) terminate this contract and receive the earnest money, thereby releasing both parties from this contract.

16. **DISPUTE RESOLUTION:** It is the policy of the State of Texas to encourage the peaceable resolution of disputes through alternative dispute resolution procedures. The parties are encouraged to use an addendum approved by TREC to submit to mediation disputes which cannot be resolved in good faith through informal discussion.

17. **ATTORNEY'S FEES:** The prevailing party in any legal proceeding brought under or with respect to the transaction described in this contract is entitled to recover from the non-prevailing party all costs of such proceeding and reasonable attorney's fees.

18. **ESCROW:** The earnest money is deposited with escrow agent with the understanding that escrow agent is not (a) a party to this contract and does not have any liability for the performance or nonperformance of any party to this contract, (b) liable for interest on the earnest money and (c) liable for any loss of earnest money caused by the failure of any financial institution in which the earnest money has been deposited unless the financial institution is acting as escrow agent. At closing, the earnest money must be applied first to any cash down payment, then to Buyer's closing costs and any excess refunded to Buyer. If both parties make written demand for the earnest money, escrow agent may require payment of unpaid expenses incurred on behalf of the parties and a written release of liability of escrow agent from all parties. If one party makes written demand for the earnest money, escrow agent shall give notice of the demand by providing to the other party a copy of the demand. If escrow agent does not receive written objection to the demand from the other party within 30 days after notice to the other party, escrow agent may disburse the earnest money to the party making demand reduced by the amount of unpaid expenses incurred on behalf of the party receiving the earnest money and escrow agent may pay the same to the creditors. If escrow agent complies with the provisions of this paragraph, each party hereby releases escrow agent from all adverse claims related to the disbursal of the earnest money. Escrow agent's notice to the other party will be effective when deposited in the U. S. Mail, postage prepaid, certified mail, return receipt requested, addressed to the other party at such party's address shown below. Notice of objection to the demand will be deemed effective upon receipt by escrow agent.

19. **REPRESENTATIONS:** Seller represents that as of the Closing Date there will be no liens, assessments, or security interests against the Property which will not be satisfied out of the sales proceeds. If any representation in this contract is untrue on the Closing Date, this contract may be terminated by Buyer and the earnest money will be refunded to Buyer. All representations contained in this contract will survive closing.

20. **FEDERAL TAX REQUIREMENT:** If Seller is a "foreign person", as defined by applicable law, or if Seller fails to deliver an affidavit that Seller is not a "foreign person", then Buyer shall withhold from the sales proceeds an amount sufficient to comply with applicable tax law and deliver the same to the Internal Revenue Service together with appropriate tax forms. IRS regulations require filing written reports if cash in excess of specified amounts is received in the transaction.

21. **AGREEMENT OF PARTIES:** This contract contains the entire agreement of the parties and cannot be changed except by their written agreement. Addenda which are a part of this contract are (list): N/A___
**AGREEMENT FOR MEDIATION, SELLER DISCLOSURE, FAS RIDER**
N/A

*C.C.*

Initialed for identification by Buyer  **L.C**  and Seller  *CEC*

(Address of Property)

2. **CONSULT YOUR ATTORNEY:** Real estate licensees cannot give legal advice. This contract is intended to be legally binding. READ IT CAREFULLY. If you do not understand the effect of this contract, consult your attorney BEFORE signing.

| Buyer's | Seller's |
|---|---|
| Attorney is: _____ | Attorney is: _____ |

23. **NOTICES:** All notices from one party to the other must be in writing and are effective when mailed to, hand-delivered at, or transmitted by facsimile machine as follows:

To Buyer at:

6219 GRIGGS # 56

N/A   Houston FX  77023

To Seller at:

10110 OLENTANGY

Houston, TX  77075

Telephone: ( 713 )  649- 8804

Telephone: ( 713 ) 943-9335

Facsimile: ( )

Facsimile: ( /A )A

EXECUTED the 18th day of _____, 19 99 (THE EFFECTIVE DATE). (BROKER: FILL
IN THE DATE OF FINAL ACCEPTANCE.)

Buyer LEONARDO CAMPOS

Seller CHARLES E. CANNIFF

Buyer _____

Seller _____

> The form of this contract has been approved by the Texas Real Estate Commission. Such approval relates to this contract form only. No representation is made as to the legal validity or adequacy of any provision in any specific transaction. It is not suitable for complex transactions. Extensive riders or additions are not to be used. Texas Real Estate Commission, P.O. Box 12188, Austin, TX 78711-2188, 1-800-250-8732 or (512) 459-6544 (http://www.trec.state.tx.us) TREC NO. 21-3. This form replaces TREC NO. 21-2.

## BROKER INFORMATION AND RATIFICATION OF FEE

Listing Broker has agreed to pay Other Broker _____ 3% _____ of the total sales price when Listing Broker's fee is received. Escrow Agent is authorized and directed to pay Other Broker from Listing Broker's fee at closing.

| THE MICHAEL GROUP | | RE/MAX CLEARLAKE | 188422 |
|---|---|---|---|
| Other Broker | License No. | Listing Broker | License No. |
| represents ☐ Seller as Listing Broker's subagent ☒ Buyer only as Buyer's agent | | represents ☐ Seller and Buyer as an intermediary ☐ Seller only as Seller's agent | |
| | | Listing Associate SANDY MCWILLIAMS | 281-VPP-1212 Telephone |
| | 281-748-8048 | | |
| Associate CECILIA GUTIERREZ | Telephone | Selling Associate | Telephone |
| 10303 N.W Freeway Houston, Texas 77091 | | 10303 N.W Freeway Houston, Texas 77091 | |
| Broker Address | | Broker Address | |
| 713-9130804 | (281)752-5944 | 713-516-6143 | 281-4882264 |
| Telephone | Facsimile | Telephone | Facsimile |

## RECEIPT

Receipt of ☐ Contract and ☐ $N/A _____ Earnest Money in the form of _____ N/A _____ is acknowledged.

Escrow Agent: N/A                                       Date: N/A _____, 19 N/A

By: _____

N/A _____                                         Telephone: ( N/A )N/A

Address

N/A _____                                         Facsimile: ( N/A )N/A

City          State          Zip Code

TREC NO. 21-3
N⁰ 026

Provided by: Broker 08/30/1999

1          STATE'S EXHIBIT NO. 11a

2

3

4

5          (Orange underpants)

6

7

8

9

10

11

12    (In the custody of the District Clerk.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    STATE'S EXHIBIT NO. 84

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Joye M. Carter, M.D., FCAP**
Chief Medical Examiner



(713) 796-9292
(713) 796-6815
FAX: (713) 796-6842

OFFICE OF THE MEDICAL EXAMINER OF HARRIS COUNTY
JOSEPH A. JACHIMCZYK FORENSIC CENTER
1885 OLD SPANISH TRAIL
HOUSTON, TEXAS 77054-2098

AUTOPSY REPORT

Case 98 - 3310

December 2, 1998

ON THE BODY OF

Tina Michelle Flood
12819 Old Pine Lane
Houston, Texas

CAUSE OF DEATH:   Blunt impact trauma to head.

MANNER OF DEATH:   Homicide.

_____     _____
Paul W. Shrode, M.D.                    Date
Assistant Medical Examiner

Reviewed and signed by:

_____     _____
Joye M. Carter, M.D., FCAP              Date
Chief Medical Examiner

STATE'S
EXHIBIT
84

POSTMORTEM EXAMINATION ON THE BODY OF

Tina Michelle Flood
12819 Old Pine Lane
Houston, Texas

HISTORY: This 23 year old Caucasian female was abducted and later found partially clothed in the passenger seat of a pick-up truck. She was transported to Clear Lake Regional, Houston, Texas, arriving at 3:00 a.m. on November 30, 1998. She was pronounced dead at 2:17 p.m. on December 1, 1998.

AUTOPSY: The autopsy was performed in the Joseph A. Jachimczyk Forensic Center of Harris County by Assistant Medical Examiner Paul W. Shrode, M.D., pursuant to Article 49.25, Texas Code of Criminal Procedure, beginning at 11:30 a.m., on December 2, 1998.

The name and medical legal case number on the Investigators Report corresponded to the name and number on the toe tag.

CLOTHING: The deceased was received into the Trace Evidence Room sealed in a plastic body bag. the seal was broken and the bag was opened in the presence of this Medical Examiner. She was dressed in a white hospital gown with a dark blue print. Trace evidence was obtained, properly documented, and rape tests were performed before the actual external examination was begun.

EXTERNAL EXAMINATION: The body was that of an adult, Caucasian female measuring 62-1/2 inches, weighing 122 pounds, and whose appearance, because of facial trauma, could not be correlated with the stated age of 23 years. Rigor mortis was full in the upper and lower extremities. Lividity was pink-purple, fixed to pressure, and was present posteriorly. Decompositional changes were not present. The body was cold to touch and had been refrigerated. The scalp had curly brown hair, which was more blonde at the ends, and was up to 11 inches in length; the right side of the scalp had been shaved to facilitate two craniotomy incisions which are described below. The ears were normally positioned. The eyes had clear corneae, gray irides, and round, equally dilated pupils at 0.5 centimeters. The palpebral conjunctivae were clear; however, there was a small amount of hemorrhage in the lateral aspect of the right bulbar conjunctivae. The nasal bone was intact. The nostrils were moist. Natural teeth were present in the upper and lower jaws and in good repair. The auditory canals were free of blood or exudate. The right earlobe had two piercings, and the left had one. The oral cavity was moist. The gums were pink. There was edema of the face, greater on the left side. The neck had no palpable adenopathy. The trachea was in the midline. The chest and abdomen were symmetrically formed. The abdomen was flat. The external genitalia were those of a normally developed

female. The back and buttocks were symmetrical. The anus showed normal anatomic features without trauma. The upper and lower extremities were symmetrically formed. The nail beds were pink to pale purple. Most of the fingernails had a red polish. The nails of great toes also had a similar color polish.

IDENTIFYING MARKS AND SCARS: There was a tattoo of a flowered wreath which encircled the naval. There was a hypopigmented area in the lower right abdominal quadrant in the shape of a Playboy bunny. There was a 1-1/2 inch, curvilinear scar in the lower lateral quadrant of the right breast.

EXTERNAL EVIDENCE OF INJURY: The right upper eyelid was a red to pale blue and mildly edematous. There was an irregular bluish contusion behind the left ear. The left ear also was edematous. There were pale red bluish contusions over the chin and one to the lateral aspect of the left lateral canthus. There was a 1 inch, irregular contusion on the right side of the neck which could be attributed to an intravenous access. There was a 1 inch contusion over the right clavicle. There was a 3 by 2 inch, irregular contusion over the sternum, which could be attributed to cardiopulmonary resuscitation. On the posterior aspect of the right hand, there was a large contusion (4-1/2 by 2 inches). There were irregular contusions about the right antecubital fossa and also the left antecubital fossa. There was a reddish brush burn abrasion of the left upper back (2-1/2 by 1-1/2 inches); a similar patterned abrasion over the left shoulder blade, approximately 5 by 3 inches; and a similar patterned abrasion over the left upper buttock, 4 by 3 inches. There was an irregular bluish contusion over the right lower back, 2 by 1 inches, and there was a 2 by 1 inch scrape abrasion on the lateral aspect of the left hip. The distal aspects of both legs had brown to pink oval contusions ranging in size from 1 inch to 1/4 inch; the right leg had eight of these contusions and the left leg had five such contusions. The thenar aspects of both thumbs were contused as was the left middle finger. The skin of the vulva and that around the anus likewise was dark blue.

INTERNAL EVIDENCE OF INJURY: There were two skull fractures, one involving the right middle cranial fossa extending into the posterior cranial fossa and the second involving the posterior cranial fossa beginning in the left occipital bone. There was marked cerebral edema. There was evidence of coup and contra coup contusions. There was marked parenchymal damage to the right frontoparietal occipital lobes and to the right cerebellum. Soft tissue hemorrhage was posterior to the left superior horn of the thyroid cartilage.

EXTERNAL EVIDENCE OF MEDICAL CARE: There were two sutured curvilinear craniotomy incisions over the right side of the head.

Case 4:13-cv-00059   Document 6-41   Filed on 03/14/13 in TXSD   Page 54 of 57

There were also two drain tubes in the right side of the head. There was a nasogastric tube in the left naris, an intravenous line in the right jugular and several electrocardiogram pads distributed over the chest. An intravenous line was in the right wrist. A pulse oximeter was on the right index finger. A sutured transverse suprapubic incision was present. Antiembolism stockings were on both legs and each leg had a plastic antishock inflation device.

INTERNAL EVIDENCE OF MEDICAL CARE: There were sutures within the peritoneal cavity secondary to the laparotomy. The tip of nasogastric tube was at the antrum.

INTERNAL EXAMINATION: <u>Section</u>: The usual Y-shaped incision exposed the organs of the thorax and abdomen to be in their normal anatomic relationships. Deep to the suprapubic incision was a 4 by 1-1/4 inch piece of skull with several burr holes; this was aligned deep to the subcutaneous fat but overlying the abdominal fascia. There was moist subcutaneous abdominal fat averaging 1/2 inch at the level of the umbilicus. The pericardium and diaphragm were intact. The serosal surfaces were wet, smooth, and glistening. No fluid accumulations were evident.

CARDIOVASCULAR SYSTEM: The 240 gram heart was normally positioned with a smooth, glistening, and intact epicardium. The chambers were of a proportionate capacity. The coronary arteries had a right dominant distribution, pursued normal courses, and were patent. The coronary ostia were normally located and were patent. The valve leaflets were thin and translucent. The valve measurements were within normal limits. The great vessels were normally formed and positioned. The heart musculature was uniformly tan-brown and was without focal abnormality. The chordae tendineae were without abnormality. The aorta was of normal caliber and followed a normal course through the thoracic and abdominal cavities. All major branches of the aorta were visibly patent. The large veins were normally distributed, thin-walled, and patent.

RESPIRATORY SYSTEM: The 690 gram right lung and the 590 gram left lung were normally formed. The tracheobronchial tree was freely patent and lined by an intact pink-tan mucosa. The visceral pleurae were pink-tan with anthracotic stippling. The parenchyma was diffusely congested without specific or focal change. The pulmonary vasculature was free of thromboemboli. Hilar lymph nodes were soft and not enlarged.

HEPATOBILIARY SYSTEM: The 1560 gram liver was normally formed. Glisson's capsule was intact. The parenchyma was soft to palpation and compression. It was uniformly dark brown and of a normal lobular architecture. The extra-hepatic biliary tree was patent.

The gallbladder was thin-walled and contained 20 milliliters of bile. No calculi were present.

ENDOCRINE SYSTEM: The pituitary gland had surrounding soft tissue hemorrhage. The adrenal glands were in normal positions and configurations and had tan-brown cortical and thin gray medullary zones. The lobes of the thyroid were symmetrical without focal change. The 80 gram pancreas was normally positioned without lesion, and the ducts were patent.

HEMATOPOIETIC SYSTEM: The 160 gram spleen was normally formed and was covered by an intact dusky-gray capsule. Its parenchyma had the usual trabecular and follicular markings. The thymus appeared involuted. Bone marrow, where visualized, appeared normal.

GENITOURINARY TRACT: The 150 gram right kidney and the 150 gram left kidney were normally formed and positioned. The cortical regions were smooth and brown, and had clear demarcation of the cortical and medullary regions. The renal pelves were nondilated. The ureters followed normal courses to the bladder. The bladder contained 5 milliliters of urine and had an intact gray-tan mucosa. The uterus and adnexa lay in normal positions. The vaginal mucosa was intact.

GASTROINTESTINAL TRACT: The esophagus followed a normal course through the thoracic cavity and was intact; its mucosa was gray-white. The stomach contained approximately 10 milliliters of a green fluid. The stomach lining was intact. It continued in the usual fashion into a normally positioned small bowel and colon. The appendix was present.

MUSCULOSKELETAL SYSTEM: The general musculature was normally formed. There were two fractures of the skull as described below and areas of the neurosurgical craniotomy.

NECK: The neck was dissected in layers. There was soft tissue discoloration both on the right and left sides of the superior horn of the thyroid cartilage ( left, greater than the right). The hyoid bone and thyroid cartilage was intact. The laryngeal mucosa was gray-tan and intact.

HEAD AND CENTRAL NERVOUS SYSTEM: The galeal and subgaleal tissues contained diffuse discoloration. The skull contained two fractures, one in the posterior cranial fossa involving the left occipital bone and the other in the right middle cranial fossa involving the temporal bone. There was some epidural, subdural, and subarachnoid hemorrhage. The leptomeninges were translucent and covered an underlying flattened gyral architecture. The cerebral hemispheres, brain stem, and cerebellum were asymmetrical. All anatomic midline structures were shifted left to

right. The vessels of the circle of Willis were normal. The dura was stripped revealing otherwise normal bony features of the calvaria and cranial fossae. The first portion of the spinal cord viewed through the foramen magnum had normal anatomic relations. Serial examination of the 1440 gram brain demonstrated marked softening and possible surgical evacuation of the right frontal and right temporal lobes, and of the right hemisphere cerebellum. There was marked softening and hemorrhage of the parenchyma of this area, and neocortex hemorrhaging was consistent with contra coup-type contusions. In the left occipital region of the scalp was a 2 centimeter contusion, which was not evident on the exterior within the hairline but was directly deep to a 2.5 centimeter parenchymal contusion over the left occipital lobe, consistent with a coup-type contusion. The pigmented areas of the substantia nigra and locus ceruleus were normal. The basal ganglia contained areas of hemorrhage, the left greater than the right. The midbrain, pons, and medulla demonstrated some areas of minor parenchymal hemorrhage.

IN ATTENDANCE:  Marlene Suarez, Forensic Photographer.
                Hugo DeLaGarza, Pathology Assistant.


## PATHOLOGICAL FINDINGS

1. Blunt impact trauma to head:
   a. Subdural hemorrhage and subarachnoid hemorrhage.
   b. Skull fractures.
   c. Coup and contra coup-type brain contusions.
   d. Cerebral edema.
   e. Diffuse cerebellar parenchymal
   f. Laceration of the left occipital subgaleal tissue. laceration.
2. Multiple areas of superficial impact trauma:
   a. Brush burn type abrasions of the posterior torso.
3. Trauma consistent with manual neck compression:
   a. Marked soft tissue hemorrhage around the left superior horn of the thyroid cartilage.
4. Evidence of acute medical and surgical care.

```
 1              TRIAL COURT CAUSE NO. 799303

 2    THE STATE OF TEXAS        )  IN THE DISTRICT COURT
                                )
 3    VS.                       )  HARRIS COUNTY, TEXAS
                                )
 4    JOHNATHAN DAVID DREW       )  183RD JUDICIAL DISTRICT

 5    _____

 6         I, GEORGETTA E. MATTOX, Official Court
      Reporter in and for the 183RD District Court of
 7    Harris County, Texas, do hereby certify that the
      above exhibits constitute true and complete
 8    duplicates of the original exhibits, excluding
      physical evidence, offered into evidence during the
 9    Trial Proceedings in the above entitled and numbered
      cause as set out herein before the Honorable JOAN
10    HUFFMAN, Judge of the 183rd District Court of Harris
      County, Texas, and a trial, beginning June 28th,
11    1999.

12              I further certify that the total cost for
      the preparation of this Reporter's Record is
13    $ 13,055  and was paid/will be paid by
      _____.
14
                WITNESS MY OFFICIAL HAND on this, the
15    29th day of April, 2000.

16

17              _____
18              GEORGETTA E. MATTOX
                Texas CSR No. 3844
19              Expiration Date:  12-31-2000
                Official Court Reporter
20              183rd District Court
                Harris County, Texas
21              301 San Jacinto
                Houston, Texas 77002
22              (713) 755-6354

23

24

25
```